Good morning this morning. We will start out with Madero v. Officer Christine Luffley et al. And we will hear first from Mr. Mercer. Thank you, Your Honor. Good morning. May it please the Court, my name is Jeremy Mercer from Nelson Mullins, Riley & Scarborough. I'm counsel for appellant, Mr. Madero, and I'm accompanied at counsel table by Cara Brack, an associate at Nelson Mullins. I would like to reserve four minutes for rebuttal. There are three general questions or issues that are raised here. The main substantive question presented to the Court is whether Haar and its employees were public actors or clothed with the authority of the state when they, without notice and an opportunity to be heard, killed many of Mr. Madero's cats and failed to return all of the others. What's the primary theory that you wish to go under? Our primary theory, Your Honor, is that this is a public function, that they were serving a public function test. And that, as Your Honors know, is that the private entity is exercising powers traditionally the exclusive prerogative of the state. How can we say it's the exclusive prerogative of the state when it involves something as specialized as caring for animals? And wouldn't the consequence of that be that every animal shelter that, you know, may be asked to care for animals in connection with a charge like this becomes a state actor? We're not saying, Your Honor, that Haar and its employees are state actors 100% of the time. We're saying when they fill the role that the city of Pittsburgh and the police department were required to fill, which is holding and preserving evidence, that is the state function that was being undertaken here by Haar and its employees. And we cited, to Your Honors, a number of cases where this court has said that there is an absolute obligation of the police to maintain and preserve evidence that is seized during a criminal investigation through the conclusion of trial. And that that evidence is to be cared for and returned unless it's contraband. But their function here, the animals aren't being given to them for purposes of chain of custody, you know, to ensure their authenticity. They're being placed with Haar for purposes of veterinary treatment and care during that period. How is that a traditional government function? It's a traditional government function, Your Honor, because Haar recognized, the police recognized, and the district court recognized that the cats were evidence. We cited, Your Honors, to evidence cited in our complaint where Haar wrote to Officer Luffy, the arresting officer, and said, are these cats to be considered evidence in the case? Officer Luffy never responded to that. Haar's policies indicate that cats that are animals that are maintained as a result of criminal investigations are considered evidence. And that anything that is done with those must be done in conjunction with the state. The trial court itself indicated, and this is on appendix page 39 in his decision on motion to dismiss, animals are not like other evidence that can be placed in a police cruiser and stored in an evidence locker without much thought beyond the basics of integrity and preservation. They are living things, living beings that need food, shelter, and care. In this particular case, just like in the Eighth Circuit case that Your Honors cited in the letter to counsel, and just like in Blake v. Delaware City, which we cited in our opening brief, when there was a tow truck operator who was considered to be a public actor because they had towed, they had taken on the police obligation of towing and storing cars that were essentially evidence in the criminal investigation, that that made them a state actor for that purpose. Not for all other purposes. Not, as Your Honor, Judge Crufts, you said, would not make all tow truck operators state actors for everything. But when they are towing cars and storing them at the direction of in a contract with the police to maintain that evidence during the investigation and during the trial, they serve a government function because they are preserving and storing evidence. But their towing, the seizure, seemed to be a significant element to the court. And we don't have participation here in the seizure. Even the other cases that seem to deal with animals, and the SPCA, for example, are involving animal control where there is participation in the seizure of the animals. Here we don't have that. This is a third party with whom the animals are stored. They're sort of dropped off. But they're not participating in the seizure of evidence. Doesn't that distinguish this case? I don't believe it does, Your Honor. And the Eighth Circuit on, sorry, I've lost the pinpoint site, page 880 of the decision, said that Inslee's was a state actor when it initially towed and stored the vehicle at the behest of the sheriff's office as part of an official criminal investigation. Inslee's relied upon government benefits in performing the tow as the sheriff's contracted vendor for the service. It had a monopoly on sheriff towing during March of 2003. And it was performing the traditional government function of seizing and securing property for a criminal investigation. I don't believe the court, when it was looking at this, was making a fine distinction that if, in fact, the company didn't tow it from the scene but merely received it from the police garage and then stored it as evidence for the duration of the trial, that it would not have been a state actor. Because the issue here, Your Honor, was the trucks, it was never returned. And that's the same thing with the cats here. The cats were taken by the police. They were placed in an evidence storage location with HAR, and they were never returned. They were destroyed. Some of them were destroyed, and none of them were returned. Did your client make a demand for their return? He did not, Your Honor, but we've pleaded, one, he did not know where the animals were taken. Also, we asked the district court that if, in fact, a demand for return was necessary, and it was not necessary in the Smith case, and it was not necessary in the Blake v. Delaware City case, that we had the ability to plead facts to show that Mr. Madero did, in fact, reach out to the people he knew might have the cats to ask about them, to inquire about them, to try to get them returned. And additionally, Your Honor, He had the ability to or that he did? He did. We have the ability to plead that he affirmatively reached out to inquire as to the status of the cats because they were his property. He wanted them back. He did not contact HAR because no one told him that the cats were being stored at HAR. He reached out to people who affirmatively were there at the time that the cats were taken to inquire, and we told the district court in our motion for reconsideration that if, in fact, this is an element that needs to be pleaded, we have the ability to do so. But you're representing that if you had the opportunity to amend that you would plead that he had made inquiry of the police? Not of the police. He reached out to the one person who gave him her telephone number as part. She was functioning. She was not an official police officer. She was Mary Kay Gentert, who, as noted in the complaint, was operating as an assistant to the police, and he reached out to her several times to inquire as to the cats. But in this particular case, Your Honor, we don't believe that that's a necessary element. But even if it is, we've pleaded that HAR started killing his cats within two days of their receipt of the cats. It was three days. It was either two or three days. We weren't quite certain, Your Honor, because of the fact that the cats were received two different days at HAR, and we weren't quite sure which of the cats were being killed. But it was within a very short period of time, yes. Wouldn't the case of West v. Atkins that we've mentioned, wouldn't that help you more than any other case? Well, I think it does, Your Honor. But West v. Atkins doesn't necessarily come out and say which of the four tests it is analyzing. No, but basically it says that the State owed a plaintiff a duty, and you're saying the duty was to protect evidence. One could argue that the duty was merely to house the animals and take care of them according to the instructions of the State. The HAR accepted that, and your client had no choice but to accept that delegation. In fact, as you said, he didn't even know where they were being housed. So why is West not applicable pretty much on point to your case? We believe it is, Your Honor, and I apologize. As I noted, I didn't read in West where the Supreme Court indicated which of the four tests it was analyzing. And I looked at it as analyzing. It's a delegation of a duty. I looked at it as part of the public function test. So I agree with Your Honor that it is. And it may be a nuanced application of the public function test. Yes, and I thought it was, Your Honor, because in that case, as Your Honor noted, it was dealing with health care to prisoners. And the court noted that that was a public function. That was a governmental obligation to provide that because the prisoners were there involuntarily. Is there a way to limit this case narrowly so that not every animal shelter, private animal shelter in the State, is a State actor? I think it is. It can be narrowed, Your Honor. It is because, as we've said at the beginning, we're saying only when the animal shelter HAR was functioning pursuant to its contract with the police, pursuant to or dealing with animals that were placed with HAR involuntarily by court order, by police action. And in that particular case, Your Honor, the West case, the CK case that we cited, the Ralston case that we cited, those all talk about the fact that when you've got persons who are involuntarily or property that is involuntarily placed in a particular situation, that's when the duty kicks in because it's because of the government action, the government contract that specifically said, these things are to be placed here, just like the prisoners went to jail because of court order, just like things went into the tow yard because of a contract with the police. In that particular situation, we're only looking at situations where the property is being held pursuant to government directive, court order, police mandate, things of that nature. Just clarify for me again. Are you hearing me? Yes. We are now. Okay. As you were talking, I was going to ask, I think you covered what I was going to say, this is a function of securing and preserving evidence. And you don't secure and preserve evidence if the dog catcher picks up a mug on the corner and takes it into you. You preserve evidence if the police or other public authorities bring you animals that they have taken for violation of law or other legal proceedings. And once you're in that category, it really doesn't matter what the owner or the catcher does or doesn't do. We agree 100% with that, Judge Roth. It is a situation, as you noted, we're looking at it only in the context of they are serving a governmental function. They are operating pursuant to or caring for something that has been relegated to their care, custody, and control by way of an arm of the government. I want to ask about your tort claims. Yes, Your Honor. As to conversion, you seem to concede that there would be lawful justification. Assuming that that's an element of conversion, you're not really arguing that lawful justification is not satisfied for conversion. You seem to be focused on whether lawful justification is an element for trespass on channels. Do I have that right? Your Honor, I noticed the red light is on. I'll answer your question. Please do. We don't contest that there was lawful justification for the initial receipt of the cats and the initial holding of the cats. What we contest, Your Honor, is the lawful justification does not exist for the ultimate destruction and ultimate dispersal to persons other than Mr. Madero of the cats. But they have a statute, 633.15, that authorizes them to do just that, where the cats are unlicensed. And there's no allegation that your clan had obtained licenses for these cats, right? There is no allegation that he obtained licenses, Your Honor. However, in this particular situation, just like in the Blake v. Delaware City case where they were dealing with impounded or towed vehicles, the court said that while the seizure was privileged, such a privilege would not excuse the failure to return the seized property after the charges were dismissed. So what we're saying, Your Honor, is that initial receipt and initial holding is correct, but after they were supposed to hold the cats until the case was completed because they were evidence. They couldn't follow 633.15 while the case was pending. And after the case was done, they were obligated pursuant to the case law we cited from this court that says you're supposed to return evidence that's held. They were supposed to return them, not destroy them. Where is there a qualifier on that statute that says that they can't either euthanize or adopt out the cats during that period pending the conclusion of the criminal case? Well, it's a city ordinance, Your Honor. It's not a state statute. And our argument is that their obligation to preserve evidence for the trial, for the charges, the cats were essentially, because he was arrested in connection with animal cruelty charges, the cats were the evidence. That would be like someone seizing a bunch of cars or seizing a bunch of cash that was the evidence for the trial. And while the trial was working towards resolution, the person holding it just decided they were going to sell, they were going to shred, they were going to get rid of the evidence. That's something that can't be done. This court has recognized, and we've cited in a number of cases, that there's an obligation to hold that evidence from beginning until conclusion of the trial. But here where there's an ordinance that purports to authorize exactly what they did, why wouldn't that go to a good faith or qualified immunity defense at the very least? First, Your Honor, that would be an affirmative defense that we wouldn't have to plead around or address in our complaint. But also, I don't think there is any good faith basis, because we cited Commonwealth v. Gonzalez in our complaint, and we cited it in our briefing. Commonwealth v. Gonzalez dealt with a situation where there was a state statute that specifically said, you're not allowed to have this animal. You're not allowed to have it at all. It's a felony. And the animal was destroyed prior to the resolution of the litigation, and the owner of the animal was able to bring successfully a challenge to the state statute that allowed for the destruction of that animal without notice and opportunity. The statute in Gonzalez allowed for the destruction, absolutely. Here, we've got a statute that distinguishes between animals that are licensed, where there's three days for someone to make a claim, and if they haven't made the claim in three days for an unlicensed animal, then those activities could proceed. For licensed animals, it has a different regimen. Isn't this quite distinguishable when you think about the due process argument that was made as to that other statute versus how it would apply here? I wouldn't think so, Your Honor, because we're dealing – essentially, the unlicensed animals would be within the – there wouldn't be a way to get a license for an illegal animal, so we're dealing with the same type, I believe, a similar type of a situation. You're dealing with essentially unlicensed animals that were allowed – that were under state statute allowed to be destroyed prior to the conclusion of the trial. And the state court said, no, you cannot do that. That's a violation of constitutional rights. The same thing here. Additionally, Your Honor, we pleaded in our complaint that Mr. Madero didn't know that HAR existed and attempted to reach out to try to find someone so that he could attempt to make a claim or talk to HAR to see about forestalling anything that they might be doing as it relates to the animals. And finally, Your Honor, there is a state statute in Pennsylvania that says in order to do anything to an animal that affects its reproductive capability, and frankly, killing an animal permanently affects its reproductive capability, one has to have a written surrender, which HAR did not have in this particular case. And I would posit that that state statute would trump the city ordinance that purports to allow destruction – But HAR was told by the police that there was a surrender, right? Officer Luffy did say to them that there was a surrender, but we also pleaded, Your Honor, that there was discussion internally at HAR that indicates that they were on notice, that there was an issue with whether a surrender actually occurred. And the state statute specifically requires not just a notification that a surrender has happened, but it requires an actual written surrender, which did not exist in this case. We will hear from you in rebuttal. Thank you, Your Honors. Mr. Benedict? Good morning, Your Honor. My name is Robert Brooklyn. Mr. Benedict is with me at counsel's table. I'm here on behalf of HAR and the HAR individual defendants. There are certain essential principles that we outlined in our briefing that we believe defeat Madero's state action claims. I'd like to briefly outline them for the Court. One, the Supreme Court of the United States has repeatedly held that receipt of public funds and even dependents, complete dependents on those funds, does not render the acts of a private organization the acts of the state. And that's from a contact. How do you distinguish the West case? Yes, Your Honor. The West case, well, first, I'm happy to distinguish. First, I would say that they have forfeited that argument. But we have the discretion, don't we, to consider something that is technically forfeited if it is forfeited? Yes, Your Honor. In the United States v. Albertson case, which is in the Third Circuit, 2011, the Court said that, and citing the explicit Rule of Appellate Procedure 28A.F. Do we have the discretion to consider something that is forfeited? Yes, Your Honor. I mean, that's what our contention versus Bunch says that we do, correct? You do have that discretion. However, it's very important to note that only in extraordinary circumstances, and that's the language used by the Court in Sims v. City of Philadelphia, as well as in the Albertson case. And then there are three factors that the Court. But essentially, isn't West just a nuanced application, perhaps, of public function? And clearly they argued public function left, right, and center, did they not? They just didn't cite West until the reply brief. The Court in West does not explicitly use the public function test. In fact, it doesn't apply any of the tests utilized by the courts, at least expressly. It was the delegation of a state function to a private entity. The private entity accepts it, and the person who is, in effect, the plaintiff, has no choice but to accept that. Correct, Your Honor. However, I would say that the case is distinguishable in several respects. One, as I've begun to say, is not enough to demonstrate that a private organization served a public function. Instead, the question is whether the function performed has been traditionally the exclusive prerogative of the state. That's the exact language from Supreme Court opinions. Did the state owe a duty to Mr. Madero, the city in this case? I believe the state, the city, owed a duty to Mr. Madero. I do not believe that Haar owed a duty to Mr. Madero. An important fact today. Did Haar accept the state's delegation of that duty? I mean, they had a contract with, I keep saying the state, Pittsburgh. They had a contract with the city, did they not? They did have a contract with the city. I do not believe that they expressly accepted any duty. In fact, that duty. When did they accept them? We're going to house impounded animals. Isn't that? They belong to someone else, at least arguably. Well, they were explicitly told that Mr. Madero had surrendered all rights to them. They did make an inquiry, and Officer Luffey said that they were surrendered. But I'm asking you, before that, the city had a duty to take in, you know, feral cats. Most cities do. And they delegated that function just like often prisons do. And the person who has the claim, or allegedly has the claim, has no choice but to accept that that has taken place. Right. Well, I would say that as far as the duty question, in West, the plaintiff possessed a protectable interest, obviously, in his own life, in his own medical care. The state had taken complete ownership of that interest by incarcerating him. And Mr. Madero has no such protectable interest because, as Judge Krause indicated, pursuant to local ordinance, no person has the right to claim it. Let's come back to the home plate. Okay. Did the city owe some duty with respect to the feral cats? The city did, I believe. Yes, Your Honor. And did the city delegate that duty to her? Well, in holding and preserving, isn't the city undertaking preserving, keeping them alive, and whatever? They can't just put them in a box and not feed them. If there is a demonstrable illness, I think they've got to call a veterinarian in. And you talk as if they are pieces of concrete evidence that you can put in a box. But when you are holding and preserving living beings as evidence and you have a contract to do that, have you not assumed the responsibility of taking care of that evidence? Well, there are a couple of things I'd say. One is it simply has not been well pleaded that they were holding these at or that HAR was holding these animals as evidence or knew that they were. They've said that. They've said it just in a conclusionary fashion. There have been no facts actually pled in support of that conclusion. Two, HAR, and this goes to our good faith defense under state law and also to the constitutional qualified immunity, is they had every reason to believe that they had every authority to do exactly as they did. So even if there is a duty, they received the cats pursuant to a search warrant. That sounds like you're making an argument on the merits. What we're trying to do is establish a threshold fact. Was HAR, in effect, the equivalent of a state actor here? No, Your Honor. And that goes to the test that the courts have laid out and the points I was raising in the beginning. One, as I said, is receipt of government funds is not enough. Even total reliance on the government is not enough. They haven't pled any amount of money that has been received. They haven't said how much money that was. And even total reliance would not be enough. But West is still good law, right? It is good law. I can't imagine, since 1988, I see nothing that in any way questions that, in fact, our court has acknowledged West. Correct. But I'd like to actually go back to West and distinguish it, if I could. Putting aside the fact that they've waived this argument and the extraordinary circumstances as laid out by the court, there's no excuse for them waiving it. But it would be, your argument would be that they forfeited it. They forfeited it, correct. In other words, I think your point is that they didn't intentionally make a decision to waive a right. They just didn't make the particular argument relating to West, even though they did argue, did they not, public function? Correct, correct. My question to you is, is West, in effect, a nuanced way of understanding public function? I don't see it that way, Your Honor, because if they were using that test, they would have said they were using that test. Instead, it's kind of the court went on its own. But my question to you is not what they argued or didn't argue. Is West a nuanced application of public function? If it is not, how is it not? I think the court could see it as a nuanced application of public function. However, that goes to the distinction. The distinction being a prisoner under the health care, under incarcerated is on the government. The state had a duty to a prisoner. The state delegated that duty to a physician. And the prisoner had no opportunity to say anything other than have the orthopedic surgeon deal with his condition. Correct. And that's not the case here. They make the point, they say, okay, well, he didn't know. So what was the – as Judge Ross noted to you, there is an obligation of the city of Pittsburgh with respect to feral cats, is there not? I wouldn't say – well, once they take the cats into their – not with respect to feral cats. I do not – With respect to the cats. Let's just say with respect to the cats here. With respect to the cats here, if a court accepts as pled that the cats were owned by Mr. Madero, then the city would have an obligation to them. But I think going to the distinctions between the two cases, one, there's an exclusive prerogative. Providing medical services is an exclusive prerogative of the state. That's not the case with respect to animal rescue and care. These services are generally performed by private, nonprofit organizations. What if we take the delegation of public function, set that to the side? That is supposed to be the most rigorous of the state action inquiries. Why isn't this satisfied just on the facts of this particular case in terms of the nexus between the governmental authorities and PAR, where they've already pleaded in the complaint the emails that indicate that they took the animals at the direction of the officer, that they were treating them as evidence and making inquiry about what level of care to provide, taking direction on that from the officer, making decisions about whether they needed to do photographs or provide medical care, directing that, taking their directions there from the officer. And they've alleged that if given the opportunity to amend the complaint that they would add additional facts, including details about the contract and the amount of money that HAR received here. Even if we don't look to the public function categorically, why aren't the specific facts here sufficient to establish a close nexus? Well, for several reasons, Your Honor. One, the exclusive program we just mentioned. Two, it sounds the court is, the close nexus test is what the court is raising. And this is quoting directly, the state can be held responsible for a decision, quote, only when it has exercised coercive power and has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state. Here are no facts to support the conclusion that a close nexus exists between the city and its policies and the treatment of the cats by HAR. No one told, this is an important point, there's a distinction here in the timeline. HAR had no involvement, zero, none. They're not pled, they're not alleged to have any involvement in the seizure of the cats, in anything that happened before the cats were actually delivered. The government is not alleged to have any involvement whatsoever after HAR had received the cats. There simply is no nexus there. Well, isn't the nexus the direction the officer is continuing to give and HAR looking to the officer for that direction? Why isn't that enough for this specific case? The only direction that the, the direction that was given by the officer was these cats have been, that he has abandoned these cats, that he has surrendered these cats. So at that point, any nexus has been severed. Further, there's no coercion. The officer has never at any point or no one from the government has said, this is how you have to treat these cats. You have to, this is how you have to preserve them. You have, I'm directing you to euthanize these cats, certain cats. I'm directing you to put up for adoption other cats. There simply is not that level of coordination that would be required under the public nexus. When you point to issues around surrender, that sounds like you're talking about things like good faith or qualified immunity, whether it was clearly established given that they're being told, you know, clearly established violation of a right when they were told that he had surrendered. But aren't those just things that you would, if we were to vacate and remand, then you move forward and those are defenses that you can raise. But why does that answer the question about whether they are a state actor? Well, I believe it answers the question under each of the tests that the court has expounded. What I was speaking to was coercion, and the court has explicitly held in Blum, in Jackson, and in many other cases that close nexus test that the court is referencing here requires a coercive power of the state. Well, it hasn't always been articulated in those terms, and even in those cases significant encouragement was enough. We have other cases like Cruz that talk about it just in terms of acting in concert. And surely with the emails we have here, you'd agree that's enough for in concert, right? I don't believe that just acting with some coordination as to the delivery of the cast and handing them over would be enough under the court's precedence. In Blum, we've seen authority where they say even where there are regulations in place that make government funds contingent on certain behaviors, such as patient transfer decisions, such as personnel decisions within a school, we've seen even in those circumstances where the entirety of their funding is dependent on certain decisions, the court has said that's not enough. That level of coordination is insufficient. I see my red lights on. Questions? Judge Roth, any further questions? I have no further questions. Thank you. Thank you. Thank you, Your Honors. I'd like to address a couple things that came out during my colleague's questions and answers. I heard him indicate that we had not pleaded or well pleaded that HAAR knew that they were holding evidence and acting as an evidence-holding facility. I would direct the court's attention to appendix page 90, paragraphs 209 and 210, where we indeed specifically referenced and alleged, based on communications that we had from HAAR, that noted that they were asking about whether they needed to hold the cats as evidence, which would indicate that they knew they were operating as an evidence-holding facility. We'd also direct Your Honor's attention to the supplemental appendix, which is an excerpt from HAAR's own policies and procedures that say a district attorney must be involved in certain decisions as it relates to animals that are being held as evidence. Again, noting that HAAR is cognizant of the fact that it operates as an evidence-holding facility. And that supplemental appendix, Your Honor, Judge Krauss, goes towards, I believe, your question about the nexus test, because it shows that there was this concerted action or this close nexus between HAAR and the government. Not only did they look to Officer Luffy to tell them essentially what level of care they needed to provide, are the cats evidence or are they not, because that will depend on what level of care they provide. Officer Luffy was working with them, saying, I need the records and I need photographs and I need this stuff for the prosecution. Stuff that HAAR may not do if, in fact, they were not holding the cats as animals. Plus, then, the DA being involved in certain decisions affecting the welfare of the cats. But that's not pleaded currently. That's something you've indicated you would include if you amended the complaint. That's correct, Your Honor. That's correct, because we posited that evidence to show that despite the district court's statement that we could not and had somehow effectively pleaded ourselves out, that this was additional evidence that we could bring to meet the test that the district court had laid out in its opinion. What specifically are you proffering you would include as to the involvement of the district attorney? We would proffer, Your Honor, that HAAR is aware of its function as an evidence-holding facility and the close connection between the state and HAAR is evidenced by Appendix 247 to Appendix 248, HAAR's own documents that say animals that are part of a court-involved case must, in all caps, must be held until the case is resolved, which, again, goes to the whole issue we were talking about in my initial questioning about the city ordinance. HAAR had made a decision that when you're dealing with cats that are in a court-involved case, that they were going to keep them for the duration of the case. Then it goes on. I'm sorry. My question was about specifically the involvement of the district attorney. What are you proffering you would include if given the opportunity to amend? That HAAR's own policies and procedures note that when there is a court-involved case, the district attorney must be involved in decision-making about whether surgeries or euthanasia should be done on any of the cats. Given that there were cats that were unquestionably, undeniably euthanized here, if HAAR is following its own policies, there must have been some involvement with the district attorney. Again, we don't have that evidence, Your Honor, but we have information that we can plead, facts that we can plead that would give us the benefit at the motion-to-dismiss stage that there is facts out there that support the claim that there was this entanglement or close nexus between the state and HAAR. I see my red light is on unless there are any other questions. One quick question. There was reference to an ordinance that supposedly you can't have a license for more than five cats. Is that correct? There was a reference to that, Your Honor, yes. And so he had 42 cats, right? There were, yes. So does it make any difference? Obviously the five. He doesn't, he never had a license for any of them. Is that correct? There was no license for any of them. That's correct. The ordinance does not, that ordinance does not require that they be licensed. Could he own the five but not own the 37 under that ordinance or what? That is one of the responses to that argument, Your Honor, is even if that ordinance applies, which we cited the court to Commonwealth versus Creighton where the Pennsylvania Commonwealth Court questioned the enforceability of an identical statute in a neighboring municipality. But at the very least, he had the ability to have five cats. And so his constitutional rights. Weren't this a group of cats that when you say 40 cats, today it may be made up of this group of cats. Tomorrow two of them may have run off and two more come in and it's a different group. Isn't this an ever-changing group of cats when you say four? So can you really claim ownership in any one of them? Your Honor, the facts as pleaded are not that the cats were interchangeable. It was the same cats. And I don't know how much to get into this because, as Your Honors are aware, discovery moved forward relative to other defendants. I mean, it did come out in discovery that these same cats would come on a regular basis when Mr. Madera would step out on the front porch and whistle for them and when he would put the food out for them. He took many of the cats for veterinary care. He had taken, I believe, 10 cats for veterinary care the two days before the seizures took place. So, in fact, there were a number of cats, yes, but he was known to and knew these cats that were seized. What is the ownership definition that you would have us use in reviewing the district court's decision? Was it right to just look at common law? Should it have looked to the definition of ownership for dogs in the statute? Well, this wasn't an issue that was raised in the briefing, Your Honor. But, again, without foreshadowing too much, again, in ruling on the summary judgment motion of Officer Luffy, the court indicated that there was significant evidence, including an admission by Officer Luffy, that Mr. Madera did, in fact, own these cats. And we would argue, Your Honor, the fact that there had to be or was a, quote-unquote, surrender, which we contend didn't happen. But if Mr. Madera is going to surrender his rights in cats, he must own those cats in order to surrender those cats. So we would assert, Your Honor, that everyone here has acceded to the fact that Mr. Madera had an ownership interest because there is some perceived surrender of them. But even under the test that was articulated by the district court, and we believe some of the statutory citations the district court made could be extrapolated to cats, even under the common law test that the district court laid out, there was sufficient evidence that came out that could be pleaded that would show that Mr. Madera did, in fact, have an ownership interest in the cats. Okay. Thank you. All right. Thank you. Thank you, Your Honor.